UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

UMB Bank, N.A., as successor
by merger to Marquette
Commercial Finance, a division
of Marquette Transportation
Finance, LLC,

        Plaintiff,

v.

Ad Lucem Inc., Christopher Carey,
Jr., and Alejandro Gil,

        Defendants.

File No. 20-cv-896 (ECT/ECW)

**OPINION AND ORDER**

_____

Benjamin J. Court and Andrew J. Glasnovich, Stinson LLP, Minneapolis, MN, for Plaintiff UMB Bank, N.A.

---

    Plaintiff UMB Bank, N.A. ("Marquette") seeks entry of a default judgment against Defendants Ad Lucem Inc., Christopher Carey Jr., and Alejandro Gil. ECF No. 12. In a nutshell, Marquette alleges that Defendants breached a financing agreement and associated contracts and converted property belonging to Marquette. The judgment Marquette seeks would include damages, contracted-for interest, and attorneys' fees in a combined amount greater than $400,000 and a declaration that Marquette's rights in certain accounts and collateral are superior to Defendants'. Marquette's motion will be granted.

    The basic process for determining whether a default judgment should be entered is straightforward. The entry of default means that "the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true." 10A Mary K. Kane,

*Federal Practice and Procedure* § 2688.1 (4th ed. Oct. 2020 update) (footnotes omitted).[1] Next, it must be determined whether the taken-as-true factual allegations of the complaint "constitute a legitimate cause of action, since a party in default does not admit mere conclusions of law." *Marshall v. Baggett*, 616 F.3d 849, 852 (8th Cir. 2010) (quoting *Murray v. Lene*, 595 F.3d 868, 871 (8th Cir. 2010)). If the taken-as-true allegations of the complaint constitute a legitimate cause of action, then the amount and other terms of the default judgment must be ascertained. *See Hagen v. Sisseton-Wahpeton Cmty. Coll.*, 205 F.3d 1040, 1042 (8th Cir. 2000).

Start with the factual allegations of the complaint that will be taken as true. Marquette's detailed complaint describes essentially an invoice-financing arrangement between the Parties. *See* Compl. ¶¶ 8–28 [ECF No. 1]. Though all of the complaint's factual allegations are accepted as true, only some of the more important allegations will be described here. On September 28, 2018, Marquette and Ad Lucem executed a contract entitled "MCF Advance Plus Revolving Credit and Security Agreement." *Id.* ¶ 8, Ex. A ("Agreement") [ECF No. 1-1 at 1–23]. Under the Agreement, Marquette promised to advance funds to Ad Lucem in exchange for the assignment of accounts "arising from the sale of goods and performance of services by Ad Lucem to its customers." Compl. ¶¶ 9–10; Agreement § 2.01. Marquette would attempt to collect assigned accounts directly

---

[1] The Clerk properly entered default. ECF No. 11. The summons and complaint were served on each Defendant between April 9 and April 23, 2020. ECF Nos. 6, 7, 8. No Defendant has responded to Marquette's complaint or otherwise appeared in the case. It bears mentioning that Marquette also served its motion for default judgment and supporting papers on Defendants. ECF No. 18. A hearing on the motion was held on November 9, 2020, but Defendants did not appear or otherwise respond. ECF No. 20.

from the account debtors. Compl. ¶ 12. The Agreement forbade Ad Lucem from attempting to collect assigned accounts unless Marquette asked or permitted Ad Lucem to do that. *Id.* ¶ 16; Agreement § 7.01. If Ad Lucem defaulted, the Agreement granted Marquette remedies, including terminating the Agreement with notice and declaring all unpaid principal and interest due immediately. Compl. ¶ 17; Agreement § 7.02. Ad Lucem granted Marquette a security interest in its accounts and "all [other] assets." Compl. ¶ 21; Agreement §§ 1.01(h), 2.02.[2] Defendants Christopher Carey Jr. and Alejandro Gil also executed personal guaranties of Ad Lucem's obligations under the Agreement. *Id.* ¶¶ 24–27, Exs. D ("Cary Guaranty") [ECF No. 1-1 at 28–32], E ("Gil Guaranty") [ECF No. 1-1 at 33–37]. On November 20, 2019, motivated by concerns that Ad Lucem's accounts "materially changed" from being primarily domestic to foreign, Marquette notified Ad Lucem of its intent to terminate the Agreement effective December 20, 2019, pursuant to a term permitting termination under any circumstances on thirty days' written notice. Compl. ¶¶ 29, 30, Ex. F [ECF No. 1-1 at 38–39]. Marquette and Ad Lucem twice agreed to extend the Agreement's termination, first until January 31, 2020, and next until March 6, 2020. *Id.* ¶¶ 31–32, Ex. G ("Termination Extension") [ECF No. 1-1 at 40–44], H ("First Am. to Termination Extension") [ECF No. 1-1 at 44–48]. Around early March 2020, Marquette learned that Ad Lucem was attempting to collect accounts assigned to Marquette directly from account debtors in breach of the Agreement. *Id.* ¶ 33. On March

---

[2] To perfect its security interest, Marquette filed UCC-1 financing statements with the Delaware and New York Secretaries of State. Compl. ¶ 22, Ex. B [ECF No. 1-1 at 24–25], Ex. C [ECF No. 1-1 at 26–27].

11, 2020, Marquette sent Defendants a notice of default, demanding immediate payment of all amounts owed under the Agreement and that Ad Lucem "cease and desist from all efforts to collect" assigned accounts. *Id.* ¶¶ 34–35, Exs. I, J, K [ECF No. 1-1 at 49–55]. The same day, Marquette demanded payment of all outstanding amounts from Carey and Gil under their personal guaranties. *Id.* ¶¶ 36–37. The following day, Carey informed Marquette via email that Ad Lucem was "shutting the business down." *Id.* ¶ 39, Ex. L [ECF No. 1-1 at 56–57]. On March 13, 2020, Marquette contacted an account debtor, Cable & Wireless Jamaica, Ltd., to collect its outstanding balance on assigned accounts. *Id.* ¶ 40. Cable & Wireless Jamaica replied that it had already remitted payment on four invoices directly to Ad Lucem. These payments totaled $61,362.20. *Id.* ¶ 41, Ex. M [ECF No. 1-1 at 58–62].

These taken-as-true allegations constitute legitimate causes of action for breach of contract and conversion under Minnesota law. Minnesota law applies because the Agreement and every other relevant contract executed by the Parties contains a Minnesota choice-of-law provision. *See* Agreement § 9.09; Carey Guaranty § 16; Gil Guaranty § 16; Termination Extension § 12; First Am. to Termination Extension § 9. Under Minnesota law, the elements of a breach-of-contract claim are "(1) formation of a contract, (2) performance by plaintiff of any conditions precedent to his right to demand performance by the defendant, and (3) breach of the contract by defendant." *Park Nicollet Clinic v. Hamann*, 808 N.W.2d 828, 833 (Minn. 2011). Marquette's complaint plainly and plausibly pleads these elements. The formation of the Agreement, personal guaranties, and later contracts are alleged in detail, and nothing about Marquette's allegations leaves room to

4

question the validity of any contract's formation. Compl. ¶¶ 8–21, 24, 26. The Agreement imposed no conditions precedent on Marquette's right to demand Ad Lucem's compliance with the Agreement's breached terms, and if giving notice were a condition precedent to triggering Marquette's remedies under the Agreement or any other contract, then Marquette has alleged that it gave notice. *Id.* ¶¶ 30–37. Marquette's allegations show that Defendants did not fulfill various payment obligations, intentionally diverted payment from at least one account debtor, and declared that Ad Lucem will cease operating, all events triggering default under the Agreement. *Id.* ¶¶ 47–50. Marquette's allegations also show that Carey and Gil breached their guaranties. *Id.* ¶¶ 54–56.[3] Conversion "is defined as an act of willful interference with personal property, 'done without lawful justification by which any person entitled thereto is deprived of use and possession." *DLH, Inc. v. Russ*, 566 N.W.2d 60, 71 (Minn. 1997) (quoting *Larson v. Archer-Daniels-Midland Co.*, 32 N.W.2d 649, 650 (Minn. 1948)). A superior and enforceable security interest may support a claim for conversion. *H&S Contracting, Inc. v. Kinetic Leasing, Inc.*, No. 17-cv-355 (JRT/LIB), 2018 WL 3340372, at *12 (D. Minn. June 8, 2018) ("[I]n the security interest context, a conversion claim is based on the secured party's security interest in the subject property."), *report and recommendation adopted*, 2018 WL 3336772 (D. Minn. July 6, 2018); *see also Farmers State Bank of Delavan v. Easton Farmers Elevator*, 457 N.W.2d 763, 766 (Minn. Ct. App. 1990). Marquette alleges that "[b]y collecting payment on the

---

[3] If Marquette were required to allege damages to state a claim for breach of contract, *see Park Nicollet Clinic*, 808 N.W.2d at 833 n.5 ("We have recognized that the plaintiff may not have to allege that the breach caused damages in order to state a claim for breach of contract."), there is no doubt it has done so. *See* Compl. ¶¶ 33–44, 51.

[a]ccounts directly and by failing to remit the proceeds to Marquette, [Defendants] have intentionally deprived Marquette of its interest in the [a]ccounts and converted Marquette's [c]ollateral." *Id.* ¶ 61. That is enough to constitute a legitimate cause of action for conversion.

Marquette seeks monetary and declaratory relief; at the hearing on this motion, Marquette withdrew a separate request for injunctive relief. Though Defendants' liability is established, Marquette "must still prove its actual damages to a reasonable degree of certainty" before entry of default judgment. *Everyday Learning Corp. v. Larson*, 242 F.3d 815, 819 (8th Cir. 2001). "A district court may determine damages by computing from the facts of record the amount that the plaintiff is lawfully entitled to recover and enter judgment accordingly." *Radisson Hotels Int'l, Inc. v. Fairmont Partners LLC*, No. 19-cv-1176 (WMW/BRT), 2020 WL 614810, at *2 (D. Minn. Feb. 10, 2020). Marquette seeks an order awarding it $379,352.81 in damages, contractual interest at a rate of $58.51 per diem through the date of judgment, and $18,931.05 in reasonable attorneys' fees and costs. To support its damages request, Marquette has filed a declaration from an assistant vice president and client manager attesting that the outstanding balance owed under the Agreement and guaranties is $379,352.81, plus interest accruing at the contractual rate of 5.5% through the date of judgment. Beaty Suppl. Decl. ¶ 2 [ECF No. 21]; *see also* Agreement § 2.06 ("In no event shall the [interest] rate with respect to any [a]ccount assigned hereunder be less than five and one-half percent (5.50%) per annum."). This evidence sufficiently establishes to a reasonable degree of certainty Marquette's lawful entitlement to the requested damages and pre-judgment interest at 5.5% per annum. The

contractual interest rate of 5.5%, however, when applied to the outstanding amount of $379,352.81, yields a per diem interest rate of $57.16. Marquette also has submitted documentation establishing both its entitlement to and the reasonableness of its request for attorneys' fees and costs. *See* Court Decl., Ex. A [ECF Nos. 16, 16-1]; Agreement § 9.04. The hourly rates and time entries documented in Marquette's submissions—which show fees and costs totaling $18,931.05—are reasonable given the complexities of this case. Finally, Marquette seeks declaratory relief under 28 U.S.C. § 2201. "A declaratory judgment is a remedy, not a cause of action." *Wolff v. Bank of N.Y. Mellon*, 997 F. Supp. 2d 964, 979 (D. Minn. 2014). "The Declaratory Judgment Act limits the issuance of declaratory judgments to cases involving an 'actual controversy.'" *HSK, LLC v. United States Olympic Comm.*, 248 F. Supp. 3d 938, 943 (D. Minn. 2017) (quoting 28 U.S.C. § 2201(a)). An actual controversy exists under the Act if "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.* (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007)). Marquette's allegations establish that there is a real and immediate controversy between it and Defendants warranting declaratory relief. Specifically, Marquette alleges that, "[i]n contravention of Marquette's interest in the [a]ccounts and [c]ollateral, [Defendants] have directed [a]ccount debtors not to pay Marquette but instead to pay [Defendants] directly." Compl. ¶ 86. Marquette also alleges that, "[b]y collecting the [a]ccounts and failing to remit the proceeds to Marquette, [Defendants] have converted, and/or are about to convert, the [c]ollateral into money for the purpose of placing the property beyond Marquette's

7

reach," *id.* ¶ 66, and that it reasonably believes Defendants "will take further action to convert Marquette's [c]ollateral," *id.* ¶ 78. These taken-as-true facts justify a declaration that Marquette's rights in the accounts and collateral are superior to Defendants' to the extent of Marquette's perfected security interests.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED THAT** Plaintiff UMB Bank, N.A.'s Motion for Default Judgment [ECF No. 12] is **GRANTED** as follows:

1. Plaintiff shall recover from Defendants jointly and severally the amount of $379,352.81 in damages and $15,385.70 in pre-judgment contractual interest.

2. Plaintiff shall recover from Defendants jointly and severally an award of $18,931.05 in attorneys' fees and costs.

3. Plaintiff's rights in the accounts and collateral under the Revolving Credit and Security Agreement of September 28, 2018 and related agreements are superior to Defendants' to the extent of Plaintiff's perfected security interests.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  November 23, 2020            s/ Eric C. Tostrud
                                     Eric C. Tostrud
                                     United States District Court